[Cite as *In re D.W.*, 2022-Ohio-66.]

STATE OF OHIO        )
                 )ss:
COUNTY OF SUMMIT    )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

IN RE: D.W.

C.A. No.      29937

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 20-03-000254

DECISION AND JOURNAL ENTRY

Dated: January 12, 2022

HENSAL, Presiding Judge.

{¶1} Appellant, S.W. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that adjudicated her infant child dependent and placed the child in the temporary custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2} Mother is the biological mother of D.W., born March 12, 2020. Mother has a history of involvement with CSB and the juvenile court with her three older children. Although the older children are not parties to this appeal, their cases are relevant to the adjudication of D.W.

{¶3} On March 23, 2020, CSB filed a complaint, alleging that D.W. was an abused, neglected, and dependent child. The supporting facts alleged in the complaint included that Mother had tested positive for methamphetamine and amphetamine shortly before the child's

birth; D.W. was born at 35 weeks' gestation and had been transferred to the neonatal intensive care unit ("NICU") because of prematurity and respiratory failure; and Mother's three older children had been adjudicated dependent in other, ongoing juvenile cases and all three remained placed outside Mother's custody. After nearly two years of working on court-ordered case plan services in those cases, Mother still had not gained insight into how her decisions put her children at substantial risk and her activities negatively impacted the wellbeing of her children. Mother's inappropriate caregiving decisions had included repeatedly leaving her young children alone or with inappropriate caregivers and exposing them to domestic violence in her home.

{¶4} D.W. was initially placed in the emergency custody of CSB and the matter later proceeded to adjudicatory and dispositional hearings. Following hearings before a magistrate, D.W. was adjudicated dependent and placed in the temporary custody of CSB. The trial court adopted those decisions, overruled Mother's objections to both decisions, and independently entered judgment adjudicating D.W. dependent and placing the child in the temporary custody of CSB. Mother appeals and raises one assignment of error.

## II.

## ASSIGNMENT OF ERROR

THE TRIAL COURT'S FINDING THAT THE MINOR CHILD WAS DEPENDENT IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶5} Mother asserts that the trial court's finding of dependency was against the manifest weight of the evidence. The trial court found that D.W. was dependent under Revised Code Sections 2151.04(C) and (D). Section 2151.04(C) defines a dependent child as one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" The focus of a dependency finding under Section

2151.04(C) is on the child's situation to determine whether the child is without proper or adequate care or support. *In re R.P.*, 9th Dist. Summit No. 26836, 2013-Ohio-5728, ¶ 19.

{¶6}    Section 2151.04(D) defines a dependent child as one "[t]o whom both of the following apply:"

> (1) The child is residing in a household in which a parent * * * committed an act that was the basis for an adjudication that a sibling of the child * * * is an abused, neglected, or dependent child.

> (2) Because of the circumstances surrounding the * * * dependency of the sibling * * * and the other conditions in the household of the child, the child is in danger of being abused or neglected by that parent * * * .

{¶7}    The trial court was required to find that CSB established dependency by clear and convincing evidence. *In re I.K.-W.*, 9th Dist. Summit No. 29100, 2019-Ohio-2807, ¶ 17, citing R.C. 2151.35(A)(1) and Juv.R. 29(E)(4).   Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶8}    In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered."  (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.  When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

**{¶9}** This Court begins its review of the record by noting that, when the trial court adjudicated this child dependent, it failed to comply with the statutory requirement that it include "specific findings as to the existence of any danger to the child and any underlying family problems that are the basis for the court's determination that the child is a dependent child." R.C. 2151.28(L). Specific factual findings underlying the adjudication of dependency not only protect the parents' rights to be informed about the specific basis of the dependency adjudication, but they also facilitate this Court's review of the trial court's adjudication. *See In re I.K.-W.*, 2019-Ohio-2807, at ¶ 24. Mother has not raised this issue on appeal, however, and this is not the exceptional case in which this Court will recognize plain error. *See In re Z.S.*, 9th Dist. Summit No. 29887, 2021-Ohio-2022, ¶ 8. The trial court's order overruling Mother's objections and adjudicating D.W. dependent, and the evidence presented at the hearing, demonstrate that the dependency adjudication of D.W. was based primarily on Mother's poor decision making, which had prevented her from having custody of her older children for the past two years.

**{¶10}** Although CSB's complaint had alleged problems with D.W. associated with Mother's drug use, the child's premature birth, and health problems that required treatment in the NICU for 12 days, little evidence was presented at the adjudicatory hearing to support those allegations. Instead, to establish that the environment at Mother's home and the dependency adjudications of Mother's older children posed a continuing threat to newborn D.W., CSB's evidence focused primarily on Mother's ongoing juvenile cases with her older three children. CSB presented the testimony of the ongoing caseworker assigned to the older children's cases as well as certified copies of records from each child's case. That evidence established that Mother

had a two-year history with CSB that continued throughout her pregnancy with D.W. and after the baby's birth.

{¶11} D.W. has three older siblings: L.B., born March 22, 2010; De.W., born September 23, 2014; and T.W., born February 13, 2019. On January 31, 2018, more than one year before T.W. was born, L.B. made a 911 call to report that De.W. was suffering a seizure. When police and EMS arrived at the home, they discovered that the children, then ages 3 and 8 years old, were home alone. The police removed L.B. and De.W. from Mother's home pursuant to Rule 6 of the Juvenile Rules of Procedure. Mother worked on a voluntary case with CSB for almost three months.

{¶12} On May 8, 2018, CSB filed complaints to allege that L.B. and De.W. were dependent children. CSB alleged, and later proved at an adjudicatory hearing, that it had received two more intake referrals about Mother leaving the children unsupervised and, when the police went to check on the children, they found them home alone. When questioned by a CSB caseworker, Mother stated that she had arranged for other adults to watch her children and blamed them for leaving her children unattended.

{¶13} The adjudications of L.B. and De.W. also established the allegations in the complaint that Mother had a long history of involving herself in abusive relationships. Mother admitted that she was then involved in a relationship with a man, L.C., who was physically and emotionally abusive to her and that she once jumped out of a moving vehicle to get away from him.

{¶14} The juvenile court initially allowed L.B. and De.W. to remain in Mother's custody under an order of protective supervision, provided she engage in case plan services and comply with an order that L.C. have no contact with her children. The case plan focused

primarily on Mother engaging in counseling and parenting classes to improve her understanding about the needs of her children and how to make proper choices to provide them with a safe and stable home. Mother was required to engage in mental health services to develop insight into how her "poor decision making" had affected her children. The goal was for Mother to ultimately demonstrate that she could safely and appropriately meet the needs of her children.

{¶15} During August 2018, the children were removed from Mother's custody because she had left them home alone overnight; she was continuing her relationship with L.C. and allowing him to have contact with the children; and she was pregnant with L.C.'s child. L.B. and De.W. were placed in the temporary custody of CSB. Both children were placed in the home of Mother's godmother ("Godmother").

{¶16} Mother continued in counseling, which focused on her developing insight into safe and age-appropriate supervision of her young children. Because Mother appeared to be making progress on the case plan goals, she was later granted some unsupervised time with her children. During her unsupervised time, Mother was expected to transport them to and from school and any medical appointments. Although Godmother offered to help, Mother often declined her assistance and instead left the children unattended and/or did not timely get them to or from school or medical appointments. For example, one school day, Godmother had offered to help Mother with L.B.'s transportation, but Mother declined. Mother apparently got delayed at another appointment but did not notify anyone that she would not be able to pick up L.B. after school. Mother later stated that her cell phone's battery had died, so she could not contact the school or anyone else. Moreover, she went home to charge her phone before she went to the school, so Mother was almost two hours late picking up L.B. after school that day.

{¶17} On another occasion, Mother called L.B. off sick from school, even though she had no legal authority to do so. She did not inform Godmother that she had done so and later left L.B. at home with a man she barely knew who has a criminal record. Mother did not dispute that there were several other times that she failed to supervise her children or get them to or from school or scheduled appointments. CSB remained concerned that, not only was Mother failing to meet the needs of her children, but she also did not seek assistance from Godmother, who was willing and able to help her.

{¶18} On February 13, 2019, Mother gave birth to T.W., who was removed from her custody shortly afterward. During the months leading up to T.W.'s birth, Mother continued to demonstrate an inability to properly care for her older children. The initial complaint, filed shortly after T.W.'s birth, was dismissed due to time constraints. CSB filed a new complaint on May 13, 2019. The complaint alleged that CSB had initially proposed a voluntary safety plan, which included Mother and T.W. living with Godmother, who was still providing a temporary placement for Mother's older children. After T.W.'s birth, however, Godmother informed CSB that she could not provide a placement for T.W. because she worked a second shift job and was not able to meet the demands of caring for a newborn baby who did not sleep through the night. T.W. was later adjudicated a dependent child and placed in the temporary custody of CSB.

{¶19} Mother worked on the same case plan goals for another year. Although she participated in counseling, Mother continued to exercise poor judgment that negatively affected the wellbeing of her children. For example, in violation of the juvenile court's no contact order, Mother continued to allow her children to have contact with L.C. On one occasion, while she was pregnant with D.W., Mother allowed L.C. into her home and an incident of domestic

violence ensued, which required police intervention. It was unclear whether Mother was injured during that altercation.

{¶20} Nearly two years after the oldest two children had been removed from Mother's custody and only two months before D.W. was born, Mother continued to demonstrate a lack of decision-making skills necessary to provide a home for young children. The trial court observed following a hearing during January 2020, that Mother was able to articulate an understanding of how her poor choices posed safety risks to her children, but she was still unable to demonstrate an ability and/or willingness to make day-to-day decisions for the welfare of her children. In addition to leaving her children unsupervised, the trial court expressed concern that Mother continued to involve herself and her children with unsuitable adults who posed a threat to their safety. Specific examples given by the court included that Mother repeatedly violated the no contact order with L.C. and once left her children alone in a car with a neighbor who had a gun in his vehicle that was visible to the children.

{¶21} The trial court also noted that Mother had a long history of failing to pay her rent on time. Mother continually paid her rent late but did not reach out to her landlord to make payment arrangements. Instead, the CSB caseworker stepped in on Mother's behalf to make payment arrangements to prevent Mother's eviction. Evidence would later reveal that Mother's rent was increased because of repeated late rent payments and her failure to attempt to work with the landlord on a payment plan.

{¶22} Mother continued to have trouble getting her older children to and from school and medical appointments in a timely manner and she continued to pay her rent late. By the time of D.W.'s birth, Mother's unsupervised time with her older children had been suspended because she continued to drive them, even though she did not have a valid driver's license, and the

caseworker had repeatedly warned her not to drive. Despite two years of working on case plan services, Mother continued to use poor judgment regarding her children. At the time the complaint pertaining to D.W. was filed, Mother's only interaction with her three older children was limited to supervised visitation because she had failed to demonstrate that she could safely care for them alone.

{¶23} Mother gave birth to D.W. on March 12, 2020. The child was born five weeks early and weighed only five pounds, nine ounces. At the hospital prior to D.W.'s birth, a toxicology screen was performed on Mother, which revealed the presence of both amphetamine and methamphetamine in her system. The doctor who delivered D.W. testified that Mother's prenatal use of either drug increased the chances that she would deliver a pre-term baby of a low birth weight. The doctor further explained that the positive drug screen would affect D.W.'s post-natal care because he would have to be observed for several days for symptoms of withdrawal from the drugs that Mother had taken.

{¶24} Although CSB offered no evidence that Mother's prenatal drug use had, in fact, caused actual physical harm to D.W., this is not an appeal from an adjudication of abuse. *See In re Baby Boy Blackshear*, 90 Ohio St.3d 197, 199-200 (2000) (reasoning that a test confirming the presence of illegal drugs in an infant's system at birth demonstrates that the child suffered a physical injury caused by the mother). This appeal is from a dependency adjudication under Sections 2151.04(C) and (D), which focus not on actual harm to the child but on the child's environment and whether the circumstances surrounding the adjudications of D.W.'s older siblings posed a threat to D.W. of being neglected by Mother.

{¶25} In this case, the evidence that Mother had used both amphetamine and methamphetamine while pregnant with D.W., coupled with all the evidence from her older

children's cases, demonstrated that Mother continued to struggle with an inability or unwillingness to make appropriate choices to safeguard the wellbeing of her children. Although drug use by Mother was not identified as a problem in the other children's cases, Mother's history of exercising poor judgment with regard to the safety of her children was. Mother's use of illegal drugs while pregnant with D.W. only further demonstrated this.

{¶26} Mother has failed to demonstrate that the trial court lost its way in finding clear and convincing evidence that D.W. was a dependent child under Revised Code Sections 2151.04(C) and (D). Her assignment of error is overruled.

### III.

{¶27} Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JENNIFER HENSAL
FOR THE COURT

CALLAHAN, J.
SUTTON, J.
CONCUR.


APPEARANCES:

ADAM M. VANHO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.

BRIAN ASHTON, Attorney at Law, for Appellee.

HOLLY FARAH, Guardian ad Litem.

TODD CONNELL, Guardian ad Litem.